STATE OF VERMONT

ENVIRONMENTAL COURT

|  | } |  |
|---|---|---|
| In re: Applications of Carusona – | } | Docket Nos. 21-1-07  Vtec |
| Concept Plan Approval for | } | and 55-3-06 Vtec |
| Planned Residential Development | } | |
|  | } | |

Decision and Order

Appellant-Applicants Richard Carusona and Alicia Carusona (Applicants) appealed from two decisions of the Development Review Board (DRB) of the Town of Brattleboro, denying their applications for a Planned Residential Development (PRD) off Old Guilford Road. Appellant-Applicants are represented by Richard D. Perra, Esq.; Interested Persons Edward G. Bohline, Christopher A. Burroughs and Melanie A. Burroughs (as trustees), Emma Jones-Higley, Kristian Higley, Alex Nislick, Lawrence Speigel and Arlene Speigel are represented by Michael J. Hertz, Esq.; and the Town is represented by Robert M. Fisher, Esq.

An evidentiary hearing was held in this matter before Merideth Wright, Environmental Judge, who also held a site visit with the parties and their representatives. The parties were given the opportunity to submit written memoranda and requests for findings. Upon consideration of the evidence as illustrated by the site visit, and of the written memoranda and requests for findings filed by the parties, the Court finds and concludes as follows.

Applicants own a 3.79-acre parcel of land with access from Old Guilford Road in the Rural Residential zoning district. Applicants' parcel was Lot 4 of the so-called Mears subdivision and was conveyed to them in August of 2005. Applicants' parcel is located generally uphill and to the south of the Bohline and the Burroughs property. Fort Dummer

1

State Park adjoins Applicants' parcel on its southerly boundary.

Interested Person Bohline owns an approximately two-acre parcel consisting of two lots that were Lots 1 and 2 of the so-called Mears subdivision and were conveyed to him in 1999; the property is improved with his single-family residence. Interested Persons Burroughs, as trustees, own an approximately one-acre lot that was Lot 3 of the so-called Mears subdivision and was conveyed to them in 1997; the property is improved with their single-family residence.

The Bohline, Burroughs and Carusona lots have access to Old Guilford Road by a deeded thirty-foot-wide right-of-way also known as "Fort Dummer Heights," which extends southerly from Old Guildford Road to the northerly boundary of the Carusona property. The Bohline property lies on the easterly side of the thirty-foot-wide deeded right-of-way, the Burroughs property lies on the westerly side of this right-of-way. Interested Persons Jones-Higley and Higley own a parcel of land improved with their single-family residence, with frontage on Old Guilford Road as well as on the northeasterly[1] side of the thirty-foot-wide deeded right-of-way. Interested Person Nislick owns a parcel of land improved with his single-family residence, with frontage on Old Guilford Road as well as on the southwesterly side of the thirty-foot-wide deeded right-of-way.

Applicants also claim access to their property from Old Guilford Road by a second

---

[1] The parties' stipulation of undisputed facts, which was filed in Court at trial, refers to this right-of-way as "running southerly from Old Guilford Road," but also refers to the Higley and the Nislick properties as being, respectively, on the northerly and the southerly sides of this right-of-way, probably because the right-of-way bends slightly to the west near Old Guilford Road. We have used the terms northeasterly and southwesterly for clarity in relation to the directional description of this right of way and the other relevant properties.

2

claimed[2] right-of-way of undefined width ("the easterly claimed right-of-way"), running south from Old Guilford Road along the easterly boundaries of the Bushey property and the Bohline property. Interested Persons Spiegel own a parcel of land, with their single-family residence, on the east side of the easterly claimed right-of-way. No evidence was presented to establish that the easement for the easterly claimed right-of-way is at least twenty-five feet in width. Given the existing placement of structures along this right-of-way, its traveled width is approximately twelve feet in width in at least one location.

Applicants' propose a Planned Residential Development of nine single-family houses on the property, with 1.3-acres of the property designated on the plan as "common area." Applicants propose that the houses and their surrounding land be in individual condominium ownership, with the areas designated as common land (and, presumably, the development roadways and infrastructure) to be owned by a homeowners' association.

Applicants' first proposal, on appeal in Docket No. 55-3-06 Vtec (the 2006 proposal), is for a nine-house PRD having access only by the easterly claimed right-of-way, with two segments of "common area" as shown on Exhibit 4. Applicants' second and preferred proposal, on appeal in Docket No. 21-1-07 Vtec (the 2007 proposal), is for a nine-house PRD of which five houses are proposed to have access by the easterly claimed right-of-way and of which four houses are proposed to have access by the western thirty-foot-wide deeded right-of-way. Both proposals depict 1.3 acres designated as "common area," largely around the perimeter of the property. In the 2007 proposal, the common area is proposed as a band ranging in width from approximately five feet to approximately eighty feet.

In both proposals, the remainder of the land between the houses is proposed to be

---

[2] This decision refers to this claimed access as "the eastern claimed right-of-way." The Environmental Court has no jurisdiction to adjudicate parties' respective property rights to a claimed right-of-way; any such claims are instead within the jurisdiction of the Superior Court.

assigned for the exclusive use of each house, as indicated by the thinner red lines on the site plans in evidence as Exhibits 1 and 2.[3]   Both applications are before the Court at the concept plan approval[4] stage of the PRD process.

Within the Rural Residential zoning district, the minimum lot area for residential uses is 1.5 acres; the minimum frontage is 150 feet, the minimum front yard setback is 40 feet, and the minimum side and rear yard setbacks are 25 feet.  Zoning Ordinance,[5] § 2342(c).  For a PRD, these requirements are waived, but § 5452(k) requires a 50-foot-wide perimeter setback for the PRD as a whole[6] and requires structures on the perimeter to be screened.  PRDs and single-family and two-family dwellings are permitted uses in the district; three- and four-family dwellings are required to obtain conditional use approval.

The maximum coverage in a PRD is 40%, § 5452(b), as contrasted with the maximum coverage of 20% otherwise required in the Rural Residential zoning district. § 2342(c). The term "coverage" is defined in Section 6 of the Zoning Ordinance as "that portion of a lot that is covered by building, structures and man-made improvements on the ground

---

[3] Applicants presented evidence that the "internal property lines" could be "adjusted" to provide more "common land," but no such adjustment is before the Court in the present proposals.

[4] Section 5430(c) of the Zoning Ordinance provides that approval of a concept plan for a PRD constitutes the classification of the project as a major subdivision; §5430(f) requires subdivision approval even if the project is to be developed without "actual subdivision" of the land into lots.  Section 5452(a) requires PRD applications to be reviewed simultaneously under the subdivision regulations and the zoning regulations.

[5] All subsequent references to section numbers are to the Zoning Ordinance unless specifically cited to the Subdivision Regulations.

[6] Section 5452(k) allows the perimeter setback requirement to be waived upon certain determinations of the DRB, and hence this Court.  No request for waiver of the perimeter setback has been made in the present case.

4

surface, such as paving, crushed stone and gravel, that prevent the absorption of storm water." Evidence was presented that the area not used for buildings and roads in the 2007 proposal is 2.55 acres; however, the evidence did not reflect whether that area also included all impervious areas. Assuming that it does, the proposed lot coverage is 32.7%, which would meet the lot coverage limitations for a PRD (but not for a conventional subdivision).

Under Section 435(1) of the Subdivision Regulations, the easement or right-of-way for utilities, drainage and access must be at least twenty-five feet in width. While the thirty-foot-wide deeded right-of-way meets this requirement, evidence was not presented to support a finding regarding the easement for the easterly claimed right-of-way and it therefore fails to meet this requirement.

Section 5452(c) of the Zoning Ordinance calculates density for a PRD by first subtracting from the total acreage the amount of land provided for the PRD's streets, and then determining the maximum number of dwelling units that could be built on the remaining land under the zoning district regulations. Although the measurement of the amount of land devoted to the streets was not provided in evidence, Applicants' engineer did testify that the total area of the property minus the streets is at least three acres in area. This decision therefore uses three acres as the figure for this calculation.

Under the regulations for the Rural Residential district, disregarding the issues of lot size and frontage, the maximum number of dwelling units that could be built on those lots as a permitted use would be four units (two duplexes). The district regulations would not allow any more than four units to be built (that is, up to eight units in two buildings of up to three or four units each) unless those three-unit or four-unit buildings were to qualify for conditional use[7] approval. Applicants did not demonstrate at trial that eight units, or,

_____

[7] In connection with this analysis it is important to distinguish this task from approval of a PRD itself, which does not require separate conditional use approval, even for its residential components which would require conditional use if proposed on their own

indeed, any three-unit or four-unit buildings, could qualify for conditional use approval on this property under the conditional use standards. § 1413(a). Rather, the evidence suggested that eight units in two four-unit buildings would <u>not</u> be able to meet the conditional use standards relating to their effect on the character of the area, traffic, or on other bylaws in effect, specifically the subdivision bylaw requiring at least a twenty-five-foot-wide right-of-way for an access roadway. In the absence of a showing that the property could qualify for two four-unit buildings, the total number of units for which a PRD may be considered on this property is four.

Even if the property were to have the potential for the full eight units under the district regulations, the evidence did not support any density bonus under § 5452(d), which allows density increases of up to 15%. To qualify for a density bonus, the DRB (and hence this Court in this appeal) must find that the developer has made a "substantial contribution to the objectives of Planned Residential Development." The proposals make no contribution to any of the objectives, as stated in the "purpose" statement of § 5410, other than by providing "greater opportunities for housing and development" than the 3.79-acre parcel would have provided as a conventional subdivision.

As well as failing to qualify for a density bonus, the proposals therefore also do not meet the requirements for concept plan approval in § 5430(b)(ii), which reiterates the objectives of § 5410. The proposals do not promote creative and efficient use of the land, creative design, an improved level of amenities, or a more attractive environment, because they do not propose clustering of the proposed units and consequent preservation of more open space than would be provided in a conventional subdivision. Rather, each proposal resembles a conventional subdivision, only with undersized lots for the district

_____

under the district regulations. Rather, the task under this section is to determine the number of units allowed to be considered in a PRD on the same property by determining the maximum number that "could be built" under the applicable district regulations.

requirements. The area of the property proposed as common open space is more or less congruent with the required fifty-foot setback or buffer around the project as a whole, which would have to be kept as open space in any event and, therefore, does not provide any additional open space. Moreover, it is steep, and a substantial portion of it is in excess of a 25% slope. Under § 5452(f), the area counted as open space in a PRD, which is required by § 5452(e) to be available for the "individual and collective use and benefit of the occupants of the development," may only include slopes in excess of 25% (as well as stream areas, bodies of water, and drainage easements) if the DRB (and hence this Court in this appeal) so determines after considering the extent of these areas in relation to the total area of the PRD and the degree to which these areas contribute to the quality, livability and amenity of the PRD. Even if the jogging path within the perimeter setback could be used safely on so steep a slope, it does not contribute materially to the amenity of the PRD already provided by the required perimeter setback.

Based on the foregoing, it is hereby ORDERED and ADJUDGED that Appellant-Applicants' application for concept plan approval is DENIED as to both proposals, concluding this appeal.

Dated at Berlin, Vermont, this 15th day of January, 2008.

_____
Merideth Wright
Environmental Judge

7